IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

September 25, 2025

LAURA A. AUSTIN, CLERK
BY:            s/A. Beeson
        DEPUTY CLERK

MEGAN STEPANSKY,                    )
                                    )
            Plaintiff,              )        Case No. 7:23-cv-00698
                                    )
v.                                  )        **MEMORANDUM OPINION**
                                    )
SOUTHWEST VIRGINIA REGIONAL )        By:    Hon. Thomas T. Cullen
JAIL AUTHORITY *et al.*,            )               United States District Judge
                                    )
            Defendants.             )

Plaintiff Megan Stepansky, proceeding *pro se*, filed this action under 42 U.S.C. § 1983 based on alleged violations of her Fourth, Fifth, Eighth, and Fourteenth Amendment rights. (*See* Am. Compl. [ECF No. 45].) Her amended complaint names Defendants Scott County, Virginia Sheriff's Department; Deputy Robert Williams; Southwest Virginia Regional Jail Authority; and Probation Officer Jessica Caldwell.[1] (*See id.* at 1.) This matter is before the court on motions to dismiss filed by Defendant Williams (Williams Mot. to Dismiss [ECF No. 71]), Defendant Caldwell (Caldwell Mot. to Dismiss [ECF No. 77]), the Scott County Sheriff's Department ("SCSD") (SCSD Mot. to Dismiss [ECF No. 73]), and the Southwest Virginia Regional Jail Authority ("SWVRJA") (SWVRJA Mot. to Dismiss [ECF No. 80]). For the following reasons, the court will grant each motion and dismiss Plaintiff's claims against each moving Defendant.

---

[1] Her amended complaint also brought claims against Wexford Health Sources and the Virginia Department of Corrections, but the Court previously dismissed those claims. (*See* Order, July 12, 2024 [ECF No. 47]; Order, Feb. 21, 2024 [ECF No. 92].)

# I.

When reviewing a motion to dismiss, the court accepts Plaintiff's allegations, as set forth in the complaint, as true. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Plaintiff alleges that, on January 15, 2023, at approximately 8:30 a.m., Deputy Robert Williams of the SCSD and another unnamed deputy arrested Plaintiff at a property located at River's Edge Road in Duffield, Virginia. (Am. Compl. 4–5.) Plaintiff had been squatting at the property, which was owned by Plaintiff's acquaintance Lynda Boyette, for approximately three weeks without incident. (*Id.* at 4.) Though Boyette had previously taken Plaintiff to the property, knowing she was homeless and in need of a place to stay during the winter, Boyette was not aware that Plaintiff was staying at the house at the time of Plaintiff's arrest. (*Id.*) Plaintiff alleges that she did not steal any of Boyette's possessions but admits to using the power connected to the residence while she was living there. (*Id.*)

At 8:30 a.m. the day of her arrest, SCSD Deputy Williams banged on the door of the River's Edge property and yelled for Plaintiff to come outside. (*Id.*) Williams did not have a warrant and had not spoken to Boyette or any of her neighbors before coming to the property. (*Id.*) When Plaintiff did not come outside, Williams and another deputy beat down the barricaded door and entered the residence. (*Id.*) The officers waited more than two hours for Boyette to come to the property. (*Id.*) Williams accused Plaintiff of being on drugs and, while waiting for Boyette to arrive, the officers kept very near to Plaintiff and scanned the residence "looking for a reason to arrest [Plaintiff]." (*Id.* at 4–5.) When Boyette arrived, the officers did not allow her to speak privately with Plaintiff and "bullied" Boyette into allowing them to

arrest Plaintiff. (*Id.* at 5.) The officers periodically turned their body cameras on and off during the roughly three hours they were at the River's Edge property. (*Id.*)

Once Boyette signed off on Plaintiff's arrest, Williams grabbed her with such force that Plaintiff involuntarily urinated. (*Id.*) Williams charged Plaintiff with three misdemeanor offenses and took her to the Southwest Virginia Regional Jail Authority in Duffield, Virginia ("SWVRJA - Duffield"). (*Id.*) During her remote bond hearing, the magistrate judge changed her charges to felony burglary with intent to steal, assault, battery, and squatting. (*Id.* (citing case numbers CR23-111, CR23-157, and CR23-158).)

Plaintiff was detained without bond at SWVRJA - Duffield from January 15, 2023, until February 17, 2023, while awaiting resolution of her criminal charges. (*Id.* at 5–6.)

The medical staff employed at SWVRJA – Duffield are hired and managed by Wexford Health Sources. (*Id.* at 6.) Upon her arrest, Plaintiff informed the SWVRJA - Duffield medical staff that she suffers from severe complex post-traumatic stress disorder ("CPTSD") and bipolar disorder and takes daily medications—Trintellix[2] and Vistaril—to treat her conditions. (*Id.* at 6.) Despite making the medical aware of this, she was not consistently given Trintellix during her time at SWVRJA - Duffield. (*See id.* at 6.) Instead, she received her medication on only 8 days of her 33-day detention. (*Id.*) According to Plaintiff, the irregularity with which she received her medication caused her mental stability to falter. (*Id.*) She claims that she suffered severe panic attacks, multiple times per day, while she was detained. (*Id.*) She further claims one nurse accused her of being "homicidal" after Plaintiff filed a grievance against the medical

---

[2] Plaintiff alleges that, prior to her arrest, she had taken 20mg of Trintellix a day for more than four years. (Am. Compl. 6.)

staff. (*Id.* at 7.) Based on this accusation, Plaintiff claims that she was isolated in the facility's Medical Ward for 13 consecutive days for "surveillance." (*Id.*)

While isolated in the Medical Ward, Plaintiff was refused medications, regular showers, and toilet paper. (*Id.*) According to Plaintiff, the male corrections officers who monitored her during her isolation watched her and other female inmates while they changed clothes and used the toilet. (*Id.*) On one occasion, a male corrections officer, Officer Spurlock, called other male guards to the window while Plaintiff was undressed. (*Id.*) Plaintiff further claims that Spurlock and others "watch[ed], mock[ed,] and laugh[ed] at nude female inmates." (*Id.*) Additionally, Plaintiff alleges she was unable to sleep during her isolation due to the "antagonization of another inmate." (*Id.*) She also claims that the SWVRJA – Duffield medical staff were "verbally and medically abusive" toward her and "mocked and laughed at" her panic attacks during her isolation in the Medical Ward. (*Id.*)

On February 1, 2023, Plaintiff filed a PREA report based on Spurlock's alleged voyeurism. (*Id.*) The same day, Plaintiff was charged with "Filing a False Report on an Officer" and was punished with a 10-day maximum-security lockdown. (*Id.* at 8.) Plaintiff appealed the charge to Captain Pike, but her appeal was unsuccessful. (*Id.*)

Plaintiff alleges that, after she was returned to general population, she witnessed Spurlock walking past the female dorm for no reason other than to watch the women in the showers. (*Id.*) She also alleges that the women's showers at SWVRJA – Duffield have only two-feet by three-feet vinyl shower curtains, forcing female inmates over 5' 5" tall to shower with their breasts exposed. (*Id.*) Plaintiff claims she witnessed male guards watching female inmates shower every day through cameras in the control room. (*Id.*) Plaintiff filed a grievance

concerning voyeurism in the shower area. (*Id.*) Thereafter, SWVRJA employees told her there used to be no shower curtains in the female shower area and threatened to remove them again if she did not "quit bitching about what she has." (*Id.*)

She was assured that the cameras facing the showers were "blacked out" so that male guards cannot see the female inmates showering, but Plaintiff claims that is false. (*Id.*) She contends that SWVRJA "accepts no responsibility" for the "sexual abuse" toward female inmates at SWVRJA – Duffield. (*Id.*) She further alleges that SWVRJA takes female inmates into closets to be strip searched, sometimes with four to five officers present, despite having a full-body scanner that obviates the need for such searches. (*Id.*) She alleges she was traumatized by the lack of concern for her privacy and forced sexual exposure at SWVRJA – Duffield, urging that it is not a safe place for female inmates. (*Id.*)

Plaintiff was ultimately convicted of felony burglary with assault and battery and was sentenced to probation. (*Id.* at 5.) Upon her release on February 17, 2023, Plaintiff's criminal attorney told her to "check in with her Tennessee Probation Officer regarding [the] case." (*Id.*) Plaintiff claims being unaware that she was supposed to check in with any Virginia Probation Officers. (*Id.*) On May 3, 2023, Plaintiff was arrested at a private residence in Salem, Ohio. (*Id.* at 9.) The SCSD had contacted the Salem Police Department to facilitate the arrest of Plaintiff on a probation violation with the intent to extradite. (*Id.*) Plaintiff alleges that the SCSD provided the Salem Police Department with her location to effect her arrest and claims that she felt "stalked and obsessed over" by the SCSD since she had not had any contact with the SCSD since her release. (*Id.*) She was incarcerated in the Columbiana County, Ohio Correctional Institution from May 3, 2023 until August 2, 2023. (*Id.*) Plaintiff refused to sign

extradition papers while incarcerated in Ohio, prompting the SCSD to issue a warrant for contempt. (*Id.*) Plaintiff was ultimately extradited back to Virginia and housed at SWVRJA – Duffield, where she remained until August 15, 2023. (*Id.*)

Upon her release, she was told to check-in with Probation Officer Jessica Caldwell within 72 hours. (*Id.*) At court on August 15, 2023, Caldwell told Plaintiff she would "come to her hotel and get her" upon her release. (*Id.* at 10.) But Caldwell did not pick Plaintiff up and did not answer Plaintiff's calls during the first 48 hours after her release. (*Id.*) Plaintiff could not get in contact with Caldwell until after reaching out to the Virginia Department of Corrections, and even then, Caldwell refused to schedule a time to meet with Plaintiff. (*Id.*) Instead, she told Plaintiff to "just show up." (*Id.*) Plaintiff claims that Caldwell's actions were a malicious attempt to cause Plaintiff to violate her probation. (*Id.*)

Caldwell and Plaintiff met on August 18, 2023. (*Id.*) During their meeting, Caldwell asked Plaintiff if she wanted "an Interstate Compact to Tennessee or Ohio." (*Id.*) Plaintiff alleges that Caldwell recognized that it was not safe for Plaintiff to remain in Southwest Virginia. (*Id.*) Caldwell arranged for a taxi to take Plaintiff to the bus station to facilitate her departure and told Plaintiff to "let her know where she lands" by August 21, 2023. (*Id.*) Caldwell agreed to have her supervision transferred to wherever Plaintiff "landed." (*Id.*)

On August 21, 2023, Plaintiff attempted to give Caldwell an address in Charlotte, North Carolina, but Caldwell would not set up an Interstate Compact with North Carolina officials. (*Id.*) Plaintiff attempted to reach out to the Virginia Department of Corrections to discuss the issue and was directed back to Scott County and Caldwell's supervisor, Jennifer Lester. (*Id.*) Plaintiff alleges that both Lester and Caldwell have known Plaintiff's location since August 21,

2023, but have simply refused to accept the Charlotte, North Carolina address that Plaintiff had provided. (*Id.*) Caldwell told Plaintiff to "get back to Virginia," despite knowing that Plaintiff does not have ties to Virginia or any way to return. (*Id.*) On August 23, 2023, Plaintiff reached out the Charlotte-Mecklenburg Probation Office to attempt to have her probation transferred, but was unable to without Caldwell's authorization. (*Id.* at 11.)

Plaintiff was subsequently arrested in Charlotte for a second probation violation. (*Id.*) She claims that Caldwell appeared in court concerning Plaintiff's probation violation without notifying Plaintiff. (*Id.*) Plaintiff refused an attorney and instead wrote a letter to the presiding judge and Commonwealth Attorney asking that her probation be transferred and the charges be dropped. (*Id.*) Plaintiff never received a response to her letter and did not appear in court. (*Id.*) She alleges that Caldwell and Lester's actions have had "severe, life-altering and dangerous consequences" for her based on her felony fugitive status. (*Id.*)

Plaintiff was arrested on October 18, 2023, by the Charlotte-Mecklenburg Police Department ("CMPD") "[f]or attempting to check her mail." (*Id.*) Plaintiff alleges that the SCSD advised the CMPD to arrest her with the intent of extraditing her back to SWVRJA – Duffield for the second probation violation. (*Id.*) She claims the SCSD have been "stalking" her electronically and physically. (*Id.*) She further alleges that, despite reaching out to the Virginia Department of Corrections regarding her concerns, she has received no response at the state level. (*Id.*)

Plaintiff claims that the SCSD and Virginia probation officers have forced her to "live in constant fear of being stalked by Police Officers" and of being "forced back into imprisonment for years" all because she was squatting at the River's Edge Property in January

2023. (*Id.*) She holds Defendants responsible for her "enduring homelessness and trauma[,] . . . night terrors, severed PTSD and panic attacks. (*Id.*) She asks the court to vacate all charges from Scott County, Virginia, order a formal apology, impose other sanctions on Defendants, and award her injunctive and monetary relief. (*Id.* at 3.)

Plaintiff summarizes her claims as follows:

> Claim #1: Scott County, VA Sheriff's Department violated Ms. Stepansky's 4th, 5th, 8th, and 14th Amendment rights and committed malicious prosecution during the arrest/prosecution involving Case No(s): CR23-111, CR23-157 & CR23-158. Resulting in her first felony conviction and the beginning of over a year of stalking and terrorizing by the Scott County, VA Sheriff's Department[;]

> Claim #2: Southwest Virginia Regional Jail Authority violate[d] Article 7 Prisoner Programs and Treatment. SWVRJA Duffield location Officers and Medical Staff are guilty of cruel & unusual punishment, deliberate indifference and punishing Ms. Stepansky for filing a PREA report. SWVRJA violated Ms. Stepanksy's 14th, 8th & 5th Amendment Rights[;]

> Claim #3: Scott County, VA Sheriff's Department and Probation Officers are guilty of Malicious Prosecution of Ms. Stepanksy. And infringement upon her Life, Liberty & Pursuit of Happiness for over a year[.]

(Am. Compl. 4–12.) The court liberally construes her amended complaint as stating the following claims:

> Claim 1(a): Violation of Plaintiff's Fourth Amendment right to be free from unreasonable search and seizure against SCSD and Deputy Robert Williams;

> Claim 1(b): Violation of Plaintiff's Fourth Amendment right to be free from malicious prosecution against SCSD and Williams;

> Claim 1(c): Violation of Plaintiff's Fourth, Eighth and/or Fourteenth Amendment right to be free from excessive force during her arrest against SCSD and Williams;

<u>Claim 2(a)</u>: Violation of Plaintiff's Fourteenth Amendment due process rights against SWVRJA;

<u>Claim 2(b)</u>: Violation of Plaintiff's Fourteenth Amendment rights by deliberate indifference to her serious medical needs against SWVRJA;

<u>Claim 2(c)</u>: Violation of Plaintiff's First Amendment right to be free from retaliation for filing a PREA report and grievance against SWVRJA;

<u>Claim 2(d)</u>: Violation of Prisoner Programs and Treatment Article 7 by SWVRJA;

<u>Claim 3(a)</u>: Violation of Plaintiff's Fourth Amendment right to be free from malicious prosecution against SCSD and Probation Officer Jessica Caldwell; and

<u>Claim 3(b)</u>: Violation of Plaintiff's Fourteenth Amendment due process rights against SCSD and Caldwell.

(*See id.*)

The remaining Defendants have each moved to dismiss Plaintiff's claims against them under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim for which relief may be granted. (*See* Williams Mot. to Dismiss; Caldwell Mot. to Dismiss; SCSD Mot. to Dismiss; SWVRJA Mot. to Dismiss). Each of Defendants' motions are ripe for review.

## II.

A motion to dismiss under Rule 12(b)(6) tests the sufficiency of a complaint. *Occupy Columbia v. Haley*, 738 F.3d 107, 116 To survive such a motion, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). To be "plausible," a plaintiff's claim must be supported by factual allegations sufficient to "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. Although this "plausibility" standard is not akin to "probability," it does require "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550

U.S. at 556). Instead, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Id.* (quoting *Twombly*, 550 U.S. at 557).

"In deciding whether a complaint will survive a motion to dismiss, a court evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citations omitted). Additionally, the court "must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Hall v. DIRECTV, LLC*, 846 F.3d 757, 765 (4th Cir. 2017) (citations omitted). "But where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief' as required by Rule 8." *Iqbal*, 556 U.S. at 679 (cleaned up).

## III.

Plaintiff's claims arise under 42 U.S.C. § 1983, which authorizes a civil action by a citizen who is deprived of "any rights, privileges, or immunities secured by the Constitution and laws" of the United States by a person acting under color of state law. To state a claim under § 1983, a plaintiff must allege both (1) "the violation of a right secured by the Constitution and laws of the United States" and (2) "that the alleged deprivation was committed by a person acting under color of state law." *Crosby v. City of Gastonia*, 635 F.3d 634, 639 (4th Cir. 2011) (quoting *West v. Atkins,* 487 U.S. 42, 48 (1988)).

**A. Defendant SCSD's Motion to Dismiss**

In support of its motion to dismiss, SCSD argues that Plaintiff cannot state any claim against it because a sheriff's department is not a "person" subject to suit under 42 U.S.C. § 1983 and because it does not have the capacity to be sued under Virginia law. (Memo. in Supp. of SCSD Mot. to Dismiss 4–6 [ECF No. 74].)

The court agrees that SCSD does not have the capacity to be sued. Under Federal Rule of Civil Procedure 17(b)(3), the capacity of a party that is neither an individual nor a corporation to be sued is determined by state law, and under Virginia law, "[l]ocal police and sheriff's departments . . . do not have the capacity to be sued." *Thompson v. City of Danville, Va.*, No. 4:10cv00012, 2011 WL 2174536, at *4 (W.D. Va. June 3, 2011) (collecting cases). All of Plaintiff's claims against SCSD will be dismissed.

**B. Defendant Williams's Motion to Dismiss**

Plaintiff's claims against Williams derive from the Fourth Amendment's protection against unreasonable searches and seizures.

<u>i. Fourth Amendment Search and Seizure Claim</u>

The Fourth Amendment safeguards "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "Because arrests are 'seizures' of 'persons,' they must be reasonable under the circumstances." *D.C. v. Wesby*, 583 U.S. 48, 56 (2018) (citing *Payton v. New York,* 445 U.S. 573, 585 (1980)). And when an arrest is made without a warrant, it is only reasonable "if the officer has probable cause to believe that the suspect committed a crime in the officer's presence." *Id.* (citing *Atwater v. Lago Vista,* 532 U.S. 318, 354 (2001)); *see also Michigan v. Summers*, 452 U.S.

692, 700, 101 S. Ct. 2587, 2593, 69 L. Ed. 2d 340 (1981) ("[E]very arrest . . . is unreasonable unless it is supported by probable cause.").

"An officer has probable cause to justify an arrest when 'facts and circumstances within the officer's knowledge . . . are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed . . . an offense.'" *English v. Clarke*, 90 F.4th 636, 646 (4th Cir. 2024) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)); *see also Wesby*, 583 U.S. at 56–57 ("To determine whether an officer had probable cause for an arrest, 'we examine the events leading up to the arrest, and then decide whether these historical facts, viewed from the standpoint of an objectively reasonable police officer, amount to probable cause.'") (quoting *Maryland v. Pringle,* 540 U.S. 366, 371 (2003)). "Because probable cause deals with probabilities and depends on the totality of the circumstances, it is a fluid concept that is not readily, or even usefully, reduced to a neat set of legal rules." *Wesby*, 583 U.S. at 57 (citations and internal quotation marks omitted). "It 'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *Id.* (quoting *Illinois v. Gates,* 462 U.S. 213, 243–44, n.13 (1983)); *see also id.* ("Probable cause is not a high bar.") (citations omitted); *see also English*, 90 F.4th at 646 ("Probable cause requires more than a bare suspicion but less than the evidence necessary to convict.") (citations omitted).

Plaintiff's claim against Williams for unreasonable search and seizure based on her January 15, 2023 arrest fails because, even taking Plaintiff's allegations as true, her arrest was supported by probable cause. Publicly available court records show that Plaintiff was charged with (i) entering a house to commit assault and battery etc., (ii) entering a property to damage,

and (iii) petit larceny of less than $1000 not from a person.[3] And Scott County Circuit court records show, consistent with Plaintiff's allegations, that she was indicted and convicted on two of these charges, though her first charge was amended to breaking and entering an occupied house to commit a misdemeanor.[4] "It has long since been settled by the Supreme Court that 'an indictment, fair upon its face, returned by a properly constituted grand jury, conclusively determines the existence of probable cause.'" *Durham v. Horner*, 690 F.3d 183, 189 (4th Cir. 2012) (quoting *Gerstein v. Pugh*, 420 U.S. 103, 117 n. 19 (1975)). Plaintiff has not alleged that Williams intentionally misled the grand jury to obtain the indictments, and thus the grand jury's probable cause determinations confirm the reasonableness of Plaintiff's arrest. *See id.*

Even setting aside the indictments and subsequent convictions, Plaintiff alleges that she was present in the River's Edge property without the knowledge or permission of the property owner and that she was using power for which Boyette was being charged. (Am. Compl. 4–5.) She also alleges that Boyette consented to her arrest. (*Id.*) Under these circumstances, a reasonable officer in Williams's position would have believed that Plaintiff was committing a crime in his presence.

---

[3] Although the court ordinarily does not consider any outside materials in deciding a motion to dismiss, the court may take judicial notice of these publicly available court records. *See Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) (noting that "the most frequent use of judicial notice of ascertainable facts is in noticing the content of court records").

[4] The Scott County records also show that Plaintiff was detained simultaneously for the same length of time on all of these charges, so to the extent Plaintiff could argue that her third charge was unjustified, Plaintiff cannot show that she was seized for any additional length of time based on Williams's decision to charge her with entering property to damage along with the other charges.

For all these reasons, Plaintiff cannot show that her arrests were unsupported by probable cause, and the court will grant Williams's motion to dismiss her Fourth Amendment claim based on the allegedly unlawful arrest.

    ii.   Malicious-Prosecution Claim

"A malicious prosecution claim under § 1983 . . . is properly understood as a Fourth Amendment claim for unreasonable seizure." *English*, 90 F.4th at 647 (citations omitted). To succeed on a Fourth Amendment malicious-prosecution claim, "a plaintiff must show that a government official charged [her] without probable cause, leading to an unreasonable seizure of [her] person." *Chiaverini v. City of Napoleon, Ohio*, 602 U.S. 556, 558 (2024) (citing *Thompson v. Clark*, 596 U.S. 36, 43 and n.2 (2022)). And a plaintiff advancing a Fourth Amendment malicious-prosecution claim "must demonstrate, among other things, that [s]he obtained a *favorable termination* of the underlying criminal prosecution." *Thompson*, 596 U.S. at 39 (emphasis in original). To demonstrate a favorable termination of a criminal prosecution for purposes of such a claim, the plaintiff must show that her prosecution "ended without a conviction." *Id.*

In Plaintiff's amended complaint, she admits that she was convicted on her felony charge (Am. Compl. 5), and available state court records confirm that she pled guilty to and was convicted of both charges. Though her charge for entering property to damage was later dropped, she cannot show that she was seized for any additional length of time based on the inclusion of this charge. *See Chiaverini*, 602 U.S. at 563 (holding that § 1983 malicious-prosecution claims are to be reviewed on a charge-by-charge basis but that, for an invalid charge to violate the Fourth Amendment, it must "caus[e] a detention either to start or continue"). Moreover, the court has already found that, even taking Plaintiff's allegations as

true, there was sufficient probable cause to support her arrest on each charge. *See Chiaverini*, 602 U.S. at 558; *see also Harris v. Town of S. Pines*, 110 F.4th 633, 649 (4th Cir. 2024) (Rushing, J., dissenting) ("If the defendant acted with probable cause, then a malicious prosecution claim cannot succeed." (citing *Chiaverini*, 602 U.S. at 558)).

For these reasons, Plaintiff's Fourth Amendment malicious-prosecution claim against Williams will be dismissed.[5]

iii.   Excessive-Force Claim

Claims that an officer used excessive force during an arrest are analyzed under the Fourth Amendment's "objective reasonableness" standard. *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (citations omitted). "In evaluating excessive force claims, the reasonableness of the officer's belief as to the appropriate level of force should be judged from that on-scene perspective." *Id.* (citations and internal quotation marks omitted). "[A]nalyzing the merits of excessive force claims 'requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.'" *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Here, Plaintiff alleges only that Williams "grabbed" her using "excessive force" and that she involuntarily urinated during the encounter. (Am. Compl 5.) She does not allege that she suffered any injuries or that Williams used any other form of force toward her during her

---

[5] To the extent Plaintiff seeks to bring a common-law malicious-prosecution claim rather than a § 1983 claim, that claim would fail for the same reasons. *See Durham v. Horner*, 690 F.3d 183, 188–90 (4th Cir. 2012) ("Because there was, as a matter of law, probable cause for [plaintiff's] arrest and detention, his state law malicious prosecution claim fails as well." (citing *Lewis v. Kei*, 708 S.E.2d 884, 889–90 (Va. 2011))).

arrest. (*See id.*) Plaintiff's limited allegations do not establish that Williams acted unreasonably under the circumstances. "It is . . . well established that the right to make an arrest carries with it the right to use a degree of physical coercion or threat thereof to effect the arrest." *Brown*, 278 F.3d at 369 (citations omitted). There are no allegations, other than Plaintiff's conclusory assertion that William's acted with excessive force, to suggest that Williams acted with anything more than the ordinary force incident to placing someone under arrest. Without more, the court cannot find that Plaintiff has stated a plausible claim for excessive force in violation of the Fourth Amendment. The court will therefore dismiss Plaintiff's excessive-force claim against Williams as well.

### C. Defendant SWVJRA's Motion to Dismiss

The SWVRJA moves to dismiss Plaintiff's claims against it on the grounds that it cannot be held vicariously liable for the alleged misconduct of the medical staff or other officers at SWVRJA – Duffield and that Plaintiff has not stated a plausible claim against SWVRJA based on municipal liability. (*See* Memo. in Supp. of SWVRJA Mot. to Dismiss 9– 16 [ECF No. 81].) SWVRJA is correct that government defendants may not be held vicariously liable under § 1983 for the actions of their employees. *See Iqbal*, 556 U.S. at 676 ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*.").

Instead, to impose § 1983 liability on SWVRJA, Plaintiff must show that "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that [SWVRJA's] officers." *Miller v. Sw. Virginia Reg'l Jail Auth. - Duffield Facility*, No. 7:21CV00010, 2021 WL 1606469, at *1

(W.D. Va. Apr. 26, 2021) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978)). Plaintiff

must show that "a policy promulgated by the SWVRJA was 'the moving force' behind the

alleged violation of [her] rights" such that its policy or custom "played a part in the alleged

violation of federal law." *Id.* (citing *Polk Cnty. v. Dodson*, 454 U.S. 312, 326 (1981); *Oklahoma

City v. Tuttle*, 471 U.S. 808, 817–18 (1985)). "To survive a motion to dismiss, a plaintiff must

plausibly allege (1) the existence of an official policy or custom, (2) that is fairly attributable to

the municipal entity, and (3) proximately caused the underlying constitutional violation." *Kiser

v. SWVRJA*, No. 7:16-CV-00129, 2016 WL 4987177, at *1 (W.D. Va. Sept. 15, 2016) (citing

*Jordan ex rel. Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)).

"Municipal policy can be found in written ordinances and regulations, affirmative

decisions of policymaking officials, or omissions by policymaking officials that manifest

deliberate indifference to the rights of citizens." *Id.* (citing *Carter v. Morris*, 164 F.3d 215, 218

(4th Cir. 1999)). Additionally, an entity's "policy" may include "practices so persistent and

widespread as to practically have the force of law." *Connick v. Thompson*, 563 U.S. 51, 61 (2011).

However, "the duration and frequency of the officers' unconstitutional conduct must indicate

that supervisory officials of the entity being sued '(1) had actual or constructive knowledge of

the conduct and (2) failed to correct it due to their deliberate indifference.'" *Sparks v. Sw. Va.

Reg'l Jail Auth.*, No. 7:23-CV-00575, 2025 WL 543189, at *3 (W.D. Va. Feb. 19, 2025) (quoting

*Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 402 (4th Cir. 2014)). "Sporadic or isolated

violations of rights will not give rise to *Monell* liability; only 'widespread or flagrant' violations

will." *Owens*, 767 F.3d at 403 (quoting *Spell v. McDaniel*, 824 F.2d 1380, 1387 (4th Cir. 1987)).

In her Amended Complaint, Plaintiff does not plausibly allege that any policy or custom of SWVRJA was the moving force behind the violation of her constitutional rights.

     i.   Deliberate Indifference to Serious Medical Needs

Concerning her claims of deliberate indifference to her serious medical needs, she alleges that the "SWVRJA medical staff" were responsible for failing to give her the proper doses of her medication. (*See* Am. Compl. 6–7.) But because she uses "SWVRJA" interchangeably to refer to the SWVRJA – Duffield facility, the medical staff at that facility, and the Southwest Virginia Regional Jail Authority, it is not totally clear which allegations are made against SWVRJA based on *its* actions versus the actions of individual employees. (*Id.*) Liberally construing her complaint, she claims that SWVRJA does not educate its medical staff "well enough to complete their required tasks to keep inmates safe." (*Id.* at 6.)

As this court has previously discussed, the Supreme Court has recognized that, "[i]n limited circumstances, a local government's decision not to train certain employees about their legal duty to avoid violating citizens' rights may rise to the level of an official government policy for purposes of § 1983." *Connick*, 563 U.S. at 61. But a municipal entity's liability for a constitutional deprivation "is at its most tenuous where a claim turns on a failure to train." *Id.* (citing *Oklahoma City v. Tuttle,* 471 U.S. 808, 822–23 (1985) (plurality opinion)). To trigger § 1983 liability on this basis, the corporation's training program must be inadequate and "the training deficiency 'must be closely related to the ultimate injury,' meaning it must cause the incident" about which the plaintiff complains. *Est. of Jones by Jones v. City of Martinsburg, W. Va.*, 961 F.3d 661, 672 (4th Cir. 2020), *as amended* (June 10, 2020) (quoting *City of Canton, Ohio v. Harris*, 489 U.S. 378, 391 (1989)). Additionally, the failure to adequately train employees "must

amount to deliberate indifference to the rights of person with whom the untrained employees come into contact." *Connick*, 563 U.S. at 61 (cleaned up). "Only then 'can such a shortcoming be properly thought of as a [corporate] 'policy or custom' that is actionable under § 1983.'" *Id.* (quoting *City of Canton*, 489 U.S. at 389).

The "deliberate indifference" required to state a claim for corporate or municipal liability requires proof that the defendant "disregarded a known or obvious consequence of [its] action." *Connick*, 562 U.S. at 61 (quoting *Bd. of Comm'rs of Bryan Cnty. v. Brown,* 520 U.S. 397, 403 (1997)); *cf. City of Canton*, 489 U.S. at 389 ("Only where a failure to train reflects a 'deliberate' or 'conscious' choice by a municipality—a 'policy' as defined by our prior cases— can a city be liable for such a failure under § 1983."). Thus, absent "actual or constructive notice that a particular omission in their training program causes [municipal] employees to violate citizens' constitutional rights," there can be no corporate liability. *Id.* (citing *Bryan Cnty.*, 520 U.S. at 407); *see id.* at 62 ("Without notice that a course of training is deficient in a particular respect, decisionmakers can hardly be said to have deliberately chosen a training program that will cause violations of constitutional rights."). And because such liability "cannot be predicated on a theory of *respondeat superior*, a single incident is almost never enough to warrant [corporate] liability." *Jones*, 961 F.3d at 672 (citing *Semple v. City of Moundsville*, 195 F.3d 708, 713–14 (4th Cir. 1999)). Instead, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." *Connick*, 563 U.S. at 62 (quoting *Bryan Cty.,* 520 U.S. at 409).

Here, Plaintiff has not alleged sufficient facts to show that SWVRJA was deliberately indifferent to the allegedly inadequate training of its employees. Moreover, for an allegedly

defective corporate training policy to create § 1983 liability, "a sufficiently close causal link must be shown between potentially inculpating training deficiency or deficiencies and specific violation." *See Spell v. McDaniel*, 824 F.2d 1380, 1390 (4th Cir. 1987); *see also id.* ("[A specific deficiency rather than general laxness or ineffectiveness in training be shown."); *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999) ("[M]unicipal liability will attach only for those policies or customs having a *specific* deficiency or deficiencies such as to make the *specific* violation almost bound to happen, sooner or later, rather than merely likely to happen in the long run.") (emphasis in original) (citations and internal quotation marks omitted).

Plaintiff does not allege, in more than a conclusory manner, that SWVRJA had notice that its employees were improperly trained to care for a prisoner's psychiatric needs or that any such deficiency would cause its employees to act with deliberate indifference to those needs. Therefore, Plaintiff has not stated a plausible claim for relief against SWVRJA regarding any alleged deliberate indifference to her medical needs.

ii.    Fourteenth Amendment Due-Process Claim

"The Fourteenth Amendment Due Process Clause protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive governmental purpose' or that is 'excessive in relation to that purpose.'" *Short v. Hartman*, 87 F.4th 593, 608–09 (4th Cir. 2023), *cert. denied*, 144 S. Ct. 2631 (2024) (quoting *Kingsley v. Hendrickson*, 576 U.S. 389, 398 (2015)). Plaintiff's other Fourteenth Amendment claim against SWVRJA is somewhat amorphous, but the court construes her amended complaint as claiming that SWVRJA violated her constitutional due-process rights while she was a pretrial detainee by isolating her in the medical ward and exposing her to voyeurism from male corrections officers at SWVRJA

– Duffield. (*See* Am. Compl. 6–8.) The vast majority of allegations supporting these claims

concern the actions of individual employees. (*See id.*) The only allegations conceivably referring

to a policy or custom of SWVRJA itself are the following:

- "SWVRJA Duffield gives female showers a 2' x 3' scrap piece of vinyl as a shower curtain" such that "[f]emale inmates over 5' 5" are forced to shower with their breasts completely exposed to the entire dorm and to all security cameras";

- "SWVRJA accepts no responsibility [for] their sexual abuse towards female inmates"; and

- "SWVRJA takes female inmates into closets to be strip searched for no apparent reason. Sometimes with 4–5 Officers present" even though "SWVRJA owns a full-body scanner and has no need to strip search female inmates in the manner they do."

(*Id.* at 8.)

As a preliminary matter, Plaintiff's allegations concern SWVRJA treatment toward all

female inmates and do not allege any specific constitutional violations she personally endured

while incarcerated there. She also alleges that she was told that the cameras overlooking the

women's shower stalls at SWVRJA – Duffield are "blacked out" and relies only on her own

speculation to declare this "false." (*Id.*) But even overlooking these potentially fatal flaws,

Plaintiff cannot succeed on any of her due-process claims against SWVRJA because she has

not clearly alleged that the decisions concerning the shower curtains or strip searches came

from a SWVRJA decisionmaker rather than jail staff. And none of Plaintiff's allegations go so

far as to establish that SWVRJA itself had actual knowledge of the jail practices underlying

Plaintiff's claims, let alone that SWVRJA was deliberately indifferent to the alleged

constitutional violations. Because Plaintiff has not demonstrated that the alleged violations are

"fairly attributable" to SWVRJA rather than to jail staff, her attempts to hold SWVRJA liable

fail. *See Kiser*, 2016 WL 4987177, at *1 (citing *Jordan*, 15 F.3d at 338). The court will therefore grant SWVRJA's motion to dismiss this claim.

     iii.    <u>First Amendment Retaliation Claim</u>

     Plaintiff has also failed to state a plausible First Amendment retaliation claim against SWVRJA because she has not alleged that any policy of SWVRJA motivated the alleged retaliation she experienced after filing grievances or her PREA report.

     In support of her retaliation claims, Plaintiff alleges that (i) a nurse accused her of being "homicidal" and she was forced into the medical ward for surveillance after filing a grievance against the SWVRJA – Duffield medical staff; (ii) she was charged with filing a false report on an officer and punished with a 10-day lockdown after filing a PREA report concerning Officer Spurlock's voyeurism; and (iii) "SWVRJA Employees" threatened to have the shower curtains at SWVRJA – Duffield if Plaintiff did not stop "bitching about what she has." (Am. Compl. 6–8.) But "not every decision by every municipal official will subject a municipality to section 1983 liability." *Roncales v. Cnty. of Henrico*, 451 F. Supp. 3d 480, 502 (E.D. Va. 2020) (quoting *Riddick v. Sch. Bd. of City of Portsmouth*, 238 F.3d 518, 523 (4th Cir. 2000)). Instead, *Monell* liability attaches "only where the decisionmaker possesses final authority to establish municipal policy with respect to the action ordered." *Id.* (quoting *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481 (1986)). And "[t]o qualify as a 'final policymaking official,' an official must have the responsibility and authority to implement final locality policy with respect to a particular course of action." *Id.* (quoting *Riddick*, 238 F.3d at 523).

     Plaintiff has not alleged that any decisionmaker with final authority on behalf of SWVRJA retaliated against her. In fact, her allegations suggest that any alleged retaliation was

enacted by jail staff. (*See* Am. Compl. 6–8.) Because she cannot show any retaliatory actions was reasonably attributable to SWVRJA itself, she cannot state a First Amendment retaliation claim against SWVRJA under *Monell*, and the court will dismiss this claim as well.

      iv.   <u>Violation of Jail Policy</u>

Finally, any claim Plaintiff seeks to assert based on the violation of internal prison policies also fails. "[A]llegations that Defendants did not follow [internal detention facility] policies or procedures, standing alone, do not amount to constitutional violations" *Jenkins v. Porter*, No. CIV.A.3:09-2697-HMH, 2010 WL 2640253, at *3 (D.S.C. June 3, 2010), *report and recommendation adopted*, No. C.A.3:09-2697-HMH, 2010 WL 2640257 (D.S.C. June 29, 2010) (collecting cases); *Jackson v. Sampson*, 536 F. App'x 356, 357 (4th Cir. 2013) ("[P]rison officials' failure to follow internal prison policies are not actionable under § 1983 unless the alleged breach of policy rises to the level of a constitutional violation."); *see also Aliff v. W. Va. Reg' Jail & Corr. Facility Auth.*, No. 2:15-CV-13513, 2016 WL 5419444, at *8 (S.D.W. Va. Sept. 26, 2016) ("To the extent Plaintiff's allegations of noncompliance with various internal prison procedures attempt to assert an independent due process claim, it is well settled that a § 1983 claim brought in federal court is not the appropriate forum to urge violations of prison regulations or state law.") (collecting cases). Because Plaintiff does not describe the contents of the regulation at issue, who violated it, or how they violated it, the court will dismiss any claim based on the alleged violation of SWVRJA internal policy or guidelines.

**D. Defendant Caldwell's Motion to Dismiss**

Defendant Caldwell moves to dismiss Plaintiff's claims against her, arguing, in part, that she is immune from suit for Plaintiff's claims. The court agrees that Caldwell is immune

from suit for damages for her role in reporting and prosecuting Plaintiff's second probation violation.[6]

Courts in this circuit have dismissed claims for damages against state probation officers performing the quasi-judicial and/or quasi-prosecutorial roles of supervising the plaintiff on behalf of the court and reporting and prosecuting suspected probation violations. *See, e.g.*, *Benthall v. Smith*, No. 1:17CV959, 2017 WL 6403025, at *1 (E.D. Va. Aug. 31, 2017), *aff'd*, 709 F. App'x 226 (4th Cir. 2018) ("Because defendant is entitled to immunity for reporting suspected pretrial release violations to the court, plaintiff's § 1983 claim for money damages must be dismissed."); *Young-Bey v. Jones*, No. CV CCB-21-771, 2021 WL 1215771, at *2 (D. Md. Mar. 31, 2021) ("Probation officers are . . . entitled to absolute immunity from suits for damages for alleged conduct performed in a quasi-judicial capacity, such as making recommendations regarding the granting or revocation of parole or pardons or investigating, preparing, and submitting reports. A determination that a violation of a parolee's conditions of supervision has occurred is a quasi-judicial function entitled to such immunity."); *Lam v. Rockingham/Harrisonburg Cir. Ct.*, No. 7:21-CV-00422, 2021 WL 3784218, at *2 (W.D. Va. Aug. 26, 2021) ("[A]ny claim for damages against the Commonwealth's Attorney or the probation officers is barred by the doctrine of prosecutorial immunity. . . . [W]hen a prosecutor takes steps to initiate judicial proceedings or appears in court to present evidence or argument, absolute immunity applies. Courts have held that probation officers are entitled to the same immunity.") (citations omitted); *Harrison v. Gunnells*, No. CV 9:23-00584-RMG-MHC, 2024

---

[6] Plaintiff's amended complaint does not appear to seek any injunctive relief from Caldwell specifically. (Am. Compl. 3.) Therefore, the court construes Plaintiff's claims against Caldwell as claims for damages only.

WL 4682522, at *6 (D.S.C. Sept. 10, 2024), *report and recommendation adopted*, No. 9:23-00584-RMG, 2024 WL 4370814 (D.S.C. Oct. 2, 2024) (finding probation officer was "entitled to prosecutorial immunity as to any claims about her acting in a prosecutorial function in prosecuting Plaintiff's probation revocation proceedings" and "to absolute immunity from a suit for damages as to any claims about any of [her] conduct that was performed in a quasi-judicial capacity").

Here, Plaintiff's allegations against Caldwell, if true, conclusively establish that she was acting in quasi-judicial and quasi-prosecutorial roles at the time of the events underlying Plaintiff's claims. Plaintiff's claims stem from Caldwell's performance of her supervisory duties, her "h[olding] Court for a second probation violation without notifying Ms. Stepansky," and her facilitating the issue of a warrant for Plaintiff's arrest. (*See* Am. Compl. 10–11.) These are paradigmatic quasi-judicial and quasi-prosecutorial roles that courts in this circuit have repeatedly found trigger absolute immunity for probation officers. So too here, the court finds Caldwell immune from suit for damages based on her execution of these functions.

## IV.

For the reasons set forth above, the Court will grant the motions to dismiss filed by Defendants Williams, SCSD, Caldwell, and SWVRJA (ECF Nos. 71, 73, 77, 80) and dismiss Plaintiff's remaining claims for relief.

The clerk is directed to send a copy of this Memorandum Opinion and the accompanying Order to the parties.

**ENTERED** this 25th day of September, 2025.

*/s/ Thomas T. Cullen*
HON. THOMAS T. CULLEN
UNITED STATES DISTRICT JUDGE